IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 4, 2020

## STATE OF TENNESSEE v. TREMAINE WILBOURN

**Appeal from the Criminal Court for Shelby County**
No. 16-00515      Lee V. Coffee, Judge

_____

## No. W2019-00305-CCA-R3-CD
_____

The Defendant, Tremaine Wilbourn, appeals his convictions for first degree premeditated murder, carjacking, employing a firearm during the commission of a dangerous felony, and possession of a firearm while having a prior felony conviction involving the use or attempted use of violence, for which he received an effective sentence of life in prison without the possibility of parole plus thirty-eight years. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction for first degree premeditated murder; (2) the trial court erred in prohibiting defense counsel from referencing a prior shooting during opening statements; (3) the trial court erred in excluding evidence of the Defendant's reason for turning himself in to the United States Marshals Service; and (4) the prosecutor improperly utilized a gun as a demonstrative aid and made improper comments during closing arguments. Upon reviewing the appellate record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

James Shae Atkinson (on appeal), and Juni Ganguli and Lauren Pasley (at trial), Memphis, Tennessee, for the appellant, Tremaine Wilbourn.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Reginald Henderson, Alanda Dwyer, and Leslie Byrd, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

The evidence presented at trial established that during the evening hours of August 1, 2015, the Defendant shot Officer Sean Bolton of the Memphis Police Department ("MPD") eight times in the street of a residential neighborhood after Officer Bolton approached an illegally parked car in which the Defendant and another occupant were weighing drugs in preparation for a drug transaction. Officer Bolton died as a result of multiple gunshot wounds. The Defendant fled the scene on foot, encountered Mr. Desric Ivory, and took Mr. Ivory's car at gunpoint. The Defendant was charged with first degree premeditated murder, carjacking, employing a firearm during the commission of a dangerous felony, to wit, carjacking, and possession of a firearm while having a prior felony conviction involving the use or attempted use of violence. Prior to trial, the State filed a notice of its intention to seek the death penalty or a sentence of life imprisonment without the possibility of parole.

### Guilt Phase

After the jury was sworn and prior to the opening statements, the Defendant announced that he was pleading not guilty to the first degree murder charge and was pleading guilty to the remaining charges. At trial, the parties stipulated that prior to August 1, 2015, the Defendant had been convicted of felonies involving the use or attempted use of violence. The parties also stipulated that prior to August 1, the Defendant was made aware of and acknowledged that given his prior convictions, it was a crime for him to own, possess, or handle a firearm. The State presented the following evidence at trial.

Mr. David Lanier testified that prior to the shooting, he received a call from someone who wanted to purchase marijuana. Mr. David Lanier agreed to allow the Defendant, with whom he had been socializing, to accompany him on the drug transaction. Mr. David Lanier left the apartment complex in his burgundy Mercedes with the Defendant in the front passenger seat. He parked the car in the front of the home of his brother, Mr. Christopher Lanier, in order to weigh the drugs prior to the transaction. Mr. David Lanier acknowledged that he parked his car "on the wrong side" of the street facing oncoming traffic.

After a few minutes, Mr. David Lanier saw a "big beam" of light flash into his car. He grabbed some of his marijuana and ran away, leaving the driver's side of the car open and a bag of marijuana on the console. He ran five or six houses down the street and jumped over a fence. He then heard five to seven gunshots. He called his girlfriend, as

well as the person to whom he was to sell the drugs. The buyer met Mr. David Lanier and drove him to the buyer's apartment where Mr. David Lanier's girlfriend met him. Upon learning that a police officer had been shot in the area from which he had fled, Mr. David Lanier contacted his attorney, met with him the following morning, and then went to the MPD's homicide office where he provided a statement. He also identified the Defendant in a photographic lineup as the person who was in the car with him on the night of Officer Bolton's death.

On cross-examination, Mr. David Lanier testified that he was not charged with selling marijuana in connection with the case, and he acknowledged that the marijuana later found by officers in his car belonged to him. He stated that he and the Defendant smoked marijuana during the fifteen-minute drive from the apartment complex to his brother's home and that the Defendant did not appear angry or upset.

Mr. Marquis Wright, Mr. Christopher Lanier, Mr. Otagor Jones, Ms. Krystal Freeman, and Ms. Deborah Crutchfield lived in the neighborhood where the shooting occurred and testified regarding the shooting. Mr. Wright testified that at around 9:00 p.m. on the night of the shooting, he was standing in the driveway of the house where he lived with his aunt and his uncle, Mr. Christopher Lanier, while smoking a cigarette. Mr. David Lanier's car was parked into front of Mr. Wright's mailbox, and the car was facing the "wrong" direction. Mr. Wright saw Mr. David Lanier sitting in the driver's seat and another man, whom he later identified as the Defendant, sitting in the passenger's seat. Mr. Wright stated that he saw a patrol car pull up and park on the opposite side of the street with its blue lights activated, but he acknowledged on cross-examination that the patrol car's lights were not activated and that the police officer shined a spotlight on Mr. David Lanier's car. Mr. David Lanier got out of the car and ran away, leaving the driver's side door open. Mr. Wright could not recall whether any of the car's lights were on but said there were street lights in the area.

Mr. Wright saw a police officer approach the car and try to pull the Defendant out. Mr. Wright did not hear the officer say anything to the Defendant, and the Defendant yelled for someone to record them. Mr. Wright stated that the Defendant and the officer were "tussling" and clarified on cross-examination that by "tussling," he meant that the Defendant tried to push the officer off of him. The Defendant then pulled out his gun and began shooting the officer, and the officer fell to the ground. Mr. Wright testified that the officer never reached for his weapon and never fired at the Defendant. Mr. Wright ran inside to tell Mr. Christopher Lanier, and the Defendant ran away. Mr. Wright later identified Mr. David Lanier in a photographic line-up as the person who ran out of the car when Officer Bolton arrived. Mr. Wright also identified the Defendant as the shooter in a photographic line-up and at trial.

Mr. Jones and Ms. Freeman lived in a home next to the home of Mr. Wright and Mr. Christopher Lanier. They were outside on their porch smoking a cigarette at the time of the shooting. Mr. Jones and Ms. Freeman testified that they saw a car parked on the street in front of their neighbor's home. The car was facing "the wrong way" and away from Mr. Jones and Ms. Freeman, and two people were inside the car. Mr. Jones said vehicles generally did not park in that manner in the neighborhood. A police car with no blue lights activated pulled up beside the car, and the police officer shined a spotlight at the car. The driver then exited the car and ran down the street at a slow pace.

The views of Mr. Jones and Ms. Freeman were blocked by bushes between their home and their neighbor's home, and they could not see the officer approach the car. Mr. Jones testified that he heard shoes "scuffling" and someone yell, "Get your phones out. They killing us. They killing us. Get your phones out." Mr. Jones did not hear the officer say anything. Four to five seconds after hearing the man yell out, Mr. Jones heard one gunshot, and after a pause of a "[s]plit second," he heard five or six gunshots in rapid succession, after which the shooter ran down the street. He heard only one gun fired. He did not see the first shot fired or the officer being hit with the bullets. Rather, he testified that before the shooter began running away, he saw the shooter walking backwards in the middle of the street while shooting five or six shots toward the police car and downward toward the ground where Mr. Jones later found the police officer. During the shooting, Mr. Jones was trying to take cover while Ms. Freeman ran inside their home. He later viewed photographic lineups but was unable to provide positive identifications of the driver of the car or the shooter.

Ms. Freeman testified that she heard "feet moving" and saw the back of the shooter. She did not hear the officer say anything but heard the shooter say, "Get your cameras out. Get your cameras out. They're killing us." Ms. Freeman stated that she heard five gunshots and that once the gunshots began, she ran inside her home to check on her children. She could not recall whether the gunshots were fired simultaneously. She said that she did not see the officer but that she heard the shots as the shooter was backing up. She did not recall whether the shooter was pointing his firearm up or down or whether one or two guns were shooting. When she came back outside, she saw the shooter running from the area.

On cross-examination, Ms. Freeman testified that she could not see the shooter shooting a gun because she could only see the shooter from behind as he was backing up. She acknowledged that she did not tell officers in her statement that she saw the shooter backing up. She was unsure whether she heard additional shots when she ran inside to check on her children.

Mr. Christopher Lanier testified that he was inside his home watching television when he heard nine gunshots all from one gun. He was walking to the front of his home to check on Mr. Wright when Mr. Wright entered the home and stated that someone had shot a police officer. Ms. Crutchfield, who lived across the street and one house down from Mr. Christopher Lanier, was also inside her home with her granddaughter when the shooting occurred. Ms. Crutchfield testified that she heard five gunshots and that her granddaughter crawled from the living room located in the front of the house into the den and stated that she heard glass shatter. Both Mr. Christopher Lanier and Ms. Crutchfield went outside once the shooting stopped.

Mr. Christopher Lanier, Mr. Jones, Ms. Freeman, and Ms. Crutchfield testified regarding finding Officer Bolton lying face-down in a driveway near his patrol car while covering his face. Mr. Christopher Lanier and Mr. Jones stated that Officer Bolton's weapon was in its holster. Ms. Crutchfield did not know the identity of Officer Bolton at the time, but she later learned that he was the "neighborhood officer" who would wave and speak to her whenever they saw each other. After neighbors tried to call 911 but only received busy signals, Mr. Christopher Lanier told Officer Bolton that he was going to call for help and used the officer's radio to report the shooting. He remained with Officer Bolton until other police officers arrived within two or three minutes.

Ms. Crutchfield testified that later, when officers were examining the scene, they asked if it was always dark in front her house. She realized that her outdoor lights were not on. The officers discovered that one of the globes to her outdoor lights had been shattered and that the glass on her storm door also was cracked.

Mr. Desric Ivory testified that sometime after 9:00 p.m. on August 1, he was getting out of his car his driveway when a man put a gun to the back of Mr. Ivory's neck. The man stated that he had just shot an officer and that he needed the car. Mr. Ivory gave his car keys to the man and ran inside his home. Mr. Ivory stated that he was able to get a clear look at the man while Mr. Ivory was entering his home, and he identified the Defendant as the perpetrator in both a photographic lineup a few days after the incident and at trial. Investigator William Merritt of the Shelby County District Attorney General's Office determined that the distance between the location of the shooting and Mr. Ivory's home was six-tenths of a mile. Mr. Ivory's vehicle, a 2002 Honda Accord, was later located at an apartment complex where the Defendant's girlfriend resided.

Ms. Lawana Stamps, a police radio dispatcher, was working on the night of Officer Bolton's death. She testified that at approximately 9:15 p.m., she went to the radio position for the Mount Mariah precinct where Officer Bolton was stationed when she heard a "brief scuffle" over the radio and a portion of an officer's identification or call number. Through research, Ms. Stamps was able to identify the officer as Officer

Bolton. Officer Bolton had not previously notified a dispatcher that he was on a traffic stop, and he did not respond to her requests for communication. Ms. Stamps received a radio transmission from someone, who she later learned to be Mr. Christopher Lanier, stating, "You have a man down." The transmission was cutting in and out, making it difficult for Ms. Stamps to understand him. She dispatched officers to the area where Officer Bolton had reportedly cleared approximately ten minutes earlier.

MPD Officer Kevin Bobo was the first officer to arrive at the scene. He testified that at approximately 9:15 p.m., he was en route to the precinct when he heard someone say a number over the radio. Through his supervisor and the dispatcher, Officer Bobo learned that the communication had come from Officer Bolton. Officer Bobo went to Officer Bolton's last known location and began riding around searching for him. He heard a citizen provide Officer Bolton's location over the radio and went to the scene. He found Officer Bolton lying face-down near his patrol car, with his hands covering his face. Officer Bobo initially believed that Officer Bolton had been knocked unconscious. He turned Officer Bolton over, saw his face injuries, called for help, and began chest compressions. Due to Officer Bolton's face injury, Officer Bobo could not administer mouth-to-mouth resuscitation. The officers had to hold the bottom of Officer Bolton's chin in order to use a respirator. Officer Bobo stated that Officer Bolton's firearm was snapped down in the holster and that Officer Bolton appeared to have been "tussling" based on the condition of his shirt.

MPD Officer Jacoba Boyd testified that he recognized Officer Bolton's voice on the radio and knew something was wrong. Upon receiving information regarding Officer Bolton's location, he went to the scene and was the third officer to arrive. Officer Boyd stated that Officer Bolton's face was "blown apart" and that he could see Officer Bolton's teeth from the hole in his face. Whenever the officers attempted to blow "rescue breaths" into Officer Bolton's mouth, the air would come out of the side of his face. Officer Boyd had to use his hand and a glove to cover Officer Bolton's facial wound to keep the air from escaping. Officer Boyd observed a bullet wound in Officer Bolton's leg, but he did not recall seeing any evidence that bullets had struck Officer Bolton's vest.

Officer Boyd observed that Officer Bolton's firearm was secured in its holster and that his belt was tightly secured. MPD Officer Christopher Sanders, who collected Officer Bolton's clothing and effects at the hospital, testified that Officer Bolton had a .40 caliber handgun and three ammunition magazines and that the handgun was fully loaded, which meant that the handgun had not been fired.

MPD Officer Jermaine Simpson also was one of the initial officers at the scene and testified regarding Officer Bolton's condition and the efforts to render aid to him. He stated that one of the paramedics pulled him aside and told him that Officer Bolton was

deceased but that they would continue to attempt to render aid. Officer Simpson said Officer Bolton's car was parked in front of a red Mercedes, and Officer Joshua Grimes moved Officer Bolton's car to make room for the ambulance. The driver's side and passenger's side doors of the Mercedes were open. Officer Simpson shined a light inside the Mercedes and saw loose marijuana, a bag of marijuana, and scales.

MPD Officer Jeffrey Garey with the Crime Scene Investigation Unit recovered ten spent nine-millimeter bullet cartridges from the area of the shooting. He located what appeared to be a fresh circular defect on a nearby wooden picket fence that was consistent with a bullet hole, but he was unable to locate a spent bullet associated with the defect. MPD Officer Andrew Hurst later returned to the scene and retrieved an additional nine-millimeter bullet cartridge that Mr. Christopher Lanier had located on the street.

A small pocket spiral notebook, a cellular phone, and a ballpoint pen were on the ground in the location of the shooting, and another cellular phone was on top of the Mercedes. MPD Officer Wilton Cleveland processed the two cellular phones, one of which belonged to Officer Bolton and the other of which Officer Cleveland determined belonged to "T. Wilbourn." Officer Cleveland retrieved photographs of the Defendant from his cellular phone and sent them to his supervisor for distribution. A mixture of DNA consistent with at least three individuals was on the Defendant's cellular phone, and the Defendant was the major contributor.

Officer Garey collected a clear plastic bag and two buds of what appeared to be marijuana, a digital scale, and a soda can from the Mercedes. MPD Officer Michael Coburn later processed the Mercedes and collected a torn clear plastic bag of what appeared to be marijuana, a small plastic bag of what appeared to be marijuana, a blue container with green, leafy residue, a Cigarillo package, and a green, leafy substance inside a compartment under the radio. The Defendant's fingerprints were lifted off the soda can, the interior door handle on the passenger's side of the Mercedes, the top outer door frame on the passenger's side door, and the top outer door frame and window frame of the rear passenger's side door.

Mr. Owen Woods with the United States Marshals Service testified that the office was contacted on August 1 to assist in locating the Defendant. Over the next several days, officers tracked down the Defendant's relatives and friends. On the evening of August 3, an officer was contacted and was told that the Defendant wanted to turn himself in to the United States Marshals Service. When the Defendant arrived, officers patted him down and handcuffed him. The officers did not observe any injuries on the Defendant, and he did not indicate that he was injured.

Dr. Marco Ross, a medical examiner with the Shelby County Medical Examiner's Office, was accepted by the trial court as an expert in forensic pathology. He testified that the autopsy of Officer Bolton was conducted by Dr. Karen Chancellor, who had since retired. Dr. Ross reviewed the autopsy records, photographs, and evidence collected during the autopsy. He stated that Officer Bolton's cause of death was multiple gunshot wounds and that his manner of death was homicide.

Dr. Ross testified that Officer Bolton sustained eight gunshot wounds. He received one bullet wound to his chin and left side of his jaw. It was a "tangential wound," with the bullet tearing along the skin and fracturing his jaw and some teeth. The bullet continued downward, exited the jaw, entered the upper left shoulder just above the collarbone, fractured the collarbone, and continued into the chest wall. Bullet fragments were recovered in the left chest wall between the shoulder blade and the ribcage. Dr. Ross noted gunpowder stippling around the initial entry wound, which meant that the muzzle of the gun was one-half of an inch to four feet away from the entry wound when the gun was fired. Dr. Ross stated that although the injury was very painful, it was not immediately lethal and that Officer Bolton likely would have survived had he received medical treatment after sustaining this wound.

A second bullet entered Officer Bolton's right forearm just below the elbow and traveled into the right upper arm where the bullet was recovered. Dr. Ross noted irregular stippling around the entry wound, some of which appeared to be gunpowder stippling. He also noted larger abrasions around the wound, suggesting that the bullet either ricocheted off a surface before entering the arm or traveled through an intermediate target, after which pieces of the intermediate target hit the skin. A third bullet entered the outer portion of Officer Bolton's right hip, traveled through soft tissue and muscle, and exited through the front of his right thigh. A fourth bullet entered the back of Officer Bolton's lower right thigh, traveled through the right femur just above the knee, and exited through the front portion of his right knee.

A fifth bullet entered the right side of Officer Bolton's torso in the mid-to-lower area of his chest. The bullet traveled through the liver, the intestines, and the mesentery, which carries the blood supply for the intestines. The bullet exited the lower abdomen below the bellybutton. Dr. Ross testified that this was a fatal injury. A sixth bullet entered the back of Officer Bolton's upper left thigh, traveled through the pelvis, perforated the left iliac artery and the intestines, and ended up in the lumbar spine. Dr. Ross classified the injuries sustained from this gunshot wound as lethal. A seventh bullet entered the back of Officer Bolton's lower left thigh, traveled through soft tissue and muscle, and fractured the left pelvic bone. Bullet fragments were recovered from the left hip region. Dr. Ross stated that if Officer Bolton was lying face down on the ground, the

locations of the bullet entry wounds were consistent with the Defendant firing the gun downward while backing away from the officer.

An eighth bullet entered Officer Bolton's right hand and traveled to the middle of the hand, fracturing some of the bones. Dr. Ross noted that the entry wound was atypical, which generally results if the bullet passes through an intermediate target or ricochets off a surface before entering the body. The bullet associated with this wound was recovered. Bullet fragments from the pelvis and left shoulder and bullets from the lumbar spine, the right arm, and the right hand were submitted for testing.

On cross-examination, Dr. Ross acknowledged that both the Defendant and Officer Bolton could have been in a number of different positions at the time of the shooting. Dr. Ross also acknowledged that he could not determine the order in which the shots were fired. He stated that he did not observe any soot on Officer Bolton's gunshot wound to his face and noted that soot on the surface of the skin typically occurs when the handgun is shot at a range of one foot or less from the target. Dr. Ross stated that the absence of soot does not necessarily mean that the gun was shot at a further distance and testified on redirect examination that soot could be erased from the area of the wound by a large amount of blood or from a breathing apparatus.

TBI Special Agent Cervinia Braswell, a forensic scientist in the Firearm Identification Unit, was accepted by the trial court as an expert in firearm identification. She examined eleven nine-millimeter cartridge casings in connection with Officer Bolton's death and concluded that all eleven cartridge casings were fired from the same firearm. She also examined bullets sent to her from the medical examiner's office and concluded that the bullets had been fired from the same firearm. She did not receive a nine-millimeter firearm to test.

Special Agent Braswell examined Officer Bolton's service weapon, a SIG Sauer .40 caliber semi-automatic pistol. She noted that each of the three magazines submitted would hold twelve cartridges and that the chamber would hold one cartridge, for a total of thirty-seven cartridges. She stated that thirty-seven cartridges were submitted with the pistol and that there was no indication that Officer Bolton fired the pistol during the shooting.

Special Agent Braswell examined Officer Bolton's clothing for bullet holes and gunshot residue. She testified that she observed a defect in Officer Bolton's shirt that corresponded with the gunshot wound to his face. She found gunshot residue around the defect, which she explained typically meant that the gun was shot at a maximum of four to five feet away. She observed a hole on the side of Officer Bolton's shirt that was consistent with the gunshot wound to the right side of his torso, and she noted that it was

an area that was not covered by the bulletproof vest. She also observed holes in the back of Officer Bolton's pants that were consistent with the two gunshot wounds to the back of his left thigh. She stated that there was gunshot residue around the hole in Officer Bolton's clothing associated with the gunshot wound to the back of his upper left thigh but that there was no gunshot residue around the hole in his clothing associated with the gunshot wound to the back of his lower left thigh. She acknowledged that a witness's testimony that the Defendant was firing shots into the ground while backing away would explain the lack of gunshot residue on the clothing associated with the gunshot wound to the back of the lower left thigh while other portions of clothing associated with gunshot wounds had gunshot residue.

The jury convicted the Defendant of first degree premeditated murder, carjacking, employing a firearm during the commission of a dangerous felony, to wit, carjacking, and possession of a firearm while having a prior felony conviction involving the use or attempted use of violence. The trial proceeded to the penalty phase, during which the jury imposed a sentence of life imprisonment without the possibility of parole. The parties reached an agreement regarding the Defendant's sentences for the remaining convictions. In accordance with that agreement, the trial court sentenced the Defendant to twenty years as a multiple offender for the carjacking conviction, eight years at 100% for the conviction for possession of a firearm during the course of a dangerous felony, and ten years as a multiple offender for his conviction for possession of a firearm while having a prior felony conviction involving the use or attempted use of violence. The trial court ordered the Defendant to serve his sentences consecutively, for an effective sentence of life imprisonment without the possibility of parole plus thirty-eight years. The Defendant filed a motion for new trial, which the trial court denied. He then filed a notice of appeal to this court.

## ANALYSIS

The Defendant contends that (1) the evidence is insufficient to support his conviction for first degree premeditated murder; (2) the trial court erred in prohibiting defense counsel from referencing a prior shooting during opening statements; (3) the trial court erred in excluding evidence of the Defendant's reason for turning himself in to the United States Marshals Office; and (4) the prosecutor improperly utilized a gun as a demonstrative aid and made improper comments during closing arguments.

### I. Sufficiency

The Defendant challenges the sufficiency of the evidence supporting his conviction for first degree premeditated murder, arguing that the evidence fails to establish that his killing of Officer Bolton was intentional and premeditated. When a

defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction is predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id*. The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*.

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id*. at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013). Factors which tend to support the existence of premeditation include: the use of a deadly weapon

upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Repeated blows, although not alone sufficient to establish premeditation, may be a relevant factor in determining the existence of premeditation. *Id.* Mutilation of the body may show that a killing was not rash or impulsive. *Davidson*, 121 S.W.3d at 616. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)).

The evidence presented at trial established that the Defendant was a passenger in a parked car facing oncoming traffic where the Defendant and Mr. David Lanier had been smoking marijuana and weighing drugs in preparation for a drug transaction. The Defendant also had possession of a gun, which he knew he was prohibited from possessing as a result of his prior criminal convictions. He had the gun hidden from view, as Mr. David Lanier testified that he did not see a gun on the Defendant. The jury could reasonably infer that the Defendant was aware that Officer Bolton would find the gun which he was prohibited from possessing if the officer arrested the Defendant on drug charges. In an effort to avoid an arrest, the Defendant struggled with Officer Bolton and pushed the officer off of him, which gave the Defendant enough time to pull out his gun and shoot the officer. The Defendant paused and then fired multiple shots in rapid succession. No witnesses heard Officer Bolton say anything to the Defendant, and Officer Bolton never drew his weapon.

The Defendant fired eleven shots and struck Officer Bolton eight times, and many of the shots were at close range. Witnesses saw the Defendant shooting down toward the ground where Officer Bolton was later found while backing away. Based upon the testimony of eyewitnesses, as well as the testimony of Dr. Ross and Special Agent Braswell regarding the location of the bullet entry wounds and the presence of gunshot residue and/or stippling in the areas of some of the entry wounds, the jury could reasonably infer that the Defendant initially shot Officer Bolton in the face and that after Officer Bolton fell to the ground, the Defendant continued shooting Officer Bolton both at close range and while backing away as the officer lay face-down on the ground. The Defendant shot Officer Bolton in areas of his body unprotected by his bulletproof vest.

The Defendant did not seek to render aid to Officer Bolton. Rather, he fled the scene and took Mr. Ivory's car from him at gunpoint. The Defendant abandoned the car

in the parking lot of the apartment complex where his girlfriend lived. He did not turn himself in to law enforcement until days later when officers were actively searching for him and closing in on his location. His gun was never located, and the jury could reasonably infer that the Defendant disposed of it prior to his arrest. We conclude that this evidence, when viewed in a light most favorable to the State, is sufficient to establish that the Defendant's killing of Officer Bolton was intentional and premeditated.

## II. Limitation of Defense Counsel's Argument During Opening Statements

The Defendant contends that the trial court erred in sustaining the prosecutor's objection to defense counsel's reference to a prior officer-involved shooting during opening statements. The Defendant maintains that the evidence was relevant to his state of mind during the shooting and to refute the State's claim that his killing of Officer Bolton was intentional and premeditated.

During opening statements, defense counsel told the jury that he would expect that the jury would hear testimony that "a few weeks earlier a young man named Darrius Stewart had been killed." The prosecutor objected, and the trial court sustained the objection, telling defense counsel, "we discussed that previously." The trial court instructed the jury to disregard any reference to someone else being killed as such information was irrelevant.

On appeal, the State argues that the Defendant has waived this issue by failing to include an adequate record on appeal. We agree. The trial court's comments reflect that the issue had been addressed previously and that the trial court had concluded that the evidence was inadmissible. However, the transcript of the hearing detailing what evidence the defense sought to present and the basis upon which the trial court held the evidence was inadmissible was not included in the appellate record. The Defendant, as the appellant, has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "In the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." *State v. Bibbs*, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing *Smith v. State*, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); *Vermilye v. State*, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). Although the State raised the issue of the inadequate record in its brief, the Defendant did not file a motion to supplement the record or otherwise attempt to rectify the problem. Accordingly, the Defendant is not entitled to relief regarding this issue.

### III.  Exclusion of Evidence of the Defendant's Decision to Surrender

After Mr. Woods testified on direct examination regarding the Defendant turning himself in to the United States Marshals Service, defense counsel asked on cross-examination, "Homicide suspects don't usually turn themselves in to the Marshal's office, do they?"  The State objected on the basis of relevance.  Defense counsel stated that he would "move on" but inquired as to whether he could ask Mr. Woods whether it was unusual for a homicide suspect to turn himself in.  Defense counsel argued that the purpose of the questioning was to establish that the Defendant was afraid that he would be killed if he turned himself in to the MPD.  The trial court found that Mr. Woods could not testify as to what the Defendant's state of mind "might have been" and that if the Defendant made such statements to Mr. Woods, the Defendant's statements would be inadmissible as self-serving.  The trial court also found that defense counsel could question the Defendant about his reasons for turning himself in to the United States Marshals Service if the Defendant testified at trial.

The Defendant maintains that the trial court erred in finding that "any reference to turning himself in to law enforcement other that [the] Memphis Police Department was irrelevant."  However, the trial court did not conclude that *any* such evidence was irrelevant.  Rather, the trial court concluded that questioning Mr. Woods regarding the Defendant's reasons for turning himself in to the United States Marshals Service related to the Defendant's state of mind about which Mr. Woods would have no such knowledge and that any statements made by the Defendant to Mr. Woods regarding the Defendant's reasons for doing so were self-serving and inadmissible.  The trial court found that such evidence could be presented through the testimony of the Defendant, but the Defendant chose not to testify at trial.

To the extent that the Defendant challenges the trial court's disallowing defense counsel from questioning Mr. Woods about the reason for the Defendant's request to surrender to the United States Marshals Service, the Defendant failed to make an offer of proof regarding what Mr. Woods's testimony would have been had defense counsel been allowed to pursue such a line of questioning.  Error may not be predicated upon a ruling excluding evidence unless "a substantial right of the party is affected" and "the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context."  Tenn. R. Evid. 103(a)(2).  An offer of proof is a means by which to ensure "effective and meaningful appellate review," and "generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded."  *State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997).  The Defendant's failure to make an offer of proof regarding what Mr. Woods's testimony would have been had the trial court allowed the Defendant to pursue

such a line of questioning precludes this court from making an effective and meaningful appellate review of the issue.  Therefore, the issue is waived.

## IV.  The Prosecutor's Conduct During Closing Arguments

The Defendant contends that the trial court erred in allowing the prosecutor to utilize a handgun that was not used in the shooting during the State's rebuttal closing argument in the guilt phase of the trial.  The Defendant argues that the prosecutor's use of the handgun had no purpose other than to inflame the jury.  The State responds that the trial court did not abuse its discretion in allowing the prosecutor to use the handgun as a demonstrative aid.  The State maintains that the prosecutor's use of the handgun by pulling the trigger once, pausing, and then pulling the trigger ten more times related to the prosecutor's argument that the killing of Officer Bolton was premeditated and that the prosecutor and the trial court informed the jury that the handgun was not used in the commission of the offenses.

During rebuttal closing argument, the prosecutor argued that the evidence established first degree murder and stated:

> And, if there is any grappling in your mind about premeditation, I would just like for you to consider this.
>
> This is not a loaded weapon.  This is not a weapon that is in evidence.  This is strictly for demonstration purposes.

Defense counsel objected, arguing that the prosecutor's "brandishing a firearm" was "clearly inappropriate."  The trial court overruled the objection, finding that the prosecutor could use demonstrative evidence in arguing that the killing was premeditated and that the prosecutor was not arguing that the handgun was the same handgun used in the shooting.  The trial court instructed the jury that the prosecutor was using a replica of a nine-millimeter handgun for demonstrative purposes only and that neither party was suggesting that the handgun was the actual gun used in the shooting.

In arguing to the jury, the prosecutor continued:

> … It is not a weapon that was involved in this case in any way.  It is simply for demonstration purposes as we talk about premeditation, and we talk about reflection and judgment, and we think about what the witnesses said, what the evidence has shown you, that there was an initial shot (demonstrates), and then there were ten more shots.

Defense counsel objected, arguing that no evidence has been presented establishing exactly how the shooting occurred. Defense counsel noted that the prosecutor had pulled the trigger on the gun once, and the prosecutor agreed that he intended to pull the trigger ten more times, which defense counsel argued was inflammatory. The trial court overruled the objection, noting that the State's theory was that the Defendant pulled the trigger of his gun eleven times, which could be reasonably inferred from the evidence. The trial court found that the prosecutor's actions were not inflammatory and were in furtherance of his argument that the killing was premeditated. The prosecutor then concluded his rebuttal closing arguing stating:

> As I was speaking to you with regard to premeditation, and, in view of what witnesses had said, like Marquis Wright and Otagar Jones, I was wanting you to consider shooting a weapon, a .9 millimeter handgun, as the spent cartridge cases indicted, and that they all came from one gun, what that might be like.
>
> And I had indicated that there was a shot (demonstrating), and then there were ten more shots (demonstrating).
>
> I submit to you that premeditation is not an issue. This is first-degree murder.

Generally, the decision of whether to permit the use of demonstrative aids rests within the discretion of the trial court. *State v. Travis Seiber*, No. W2015-00221-CCA-R3-CD, 2016 WL 716307, at *5 (Tenn. Crim. App. Feb. 23, 2016) (citing *State v. West*, 767 S.W.2d 387, 402 (Tenn. 1989); *State v. Delk*, 692 S.W.2d 431 (Tenn. Crim. App. 1985)). The introduction of demonstrative evidence is permissible not only during trial but also during closing arguments, so long as the demonstrative evidence is based on the proof introduced at trial. *See, e.g., State v. Hawkins*, 519 S.W.3d 1, 50 (Tenn. 2017) (concluding that the prosecutor's use of a saw similar to that used by the defendant during rebuttal closing argument to demonstrate how the defendant dismembered the victim did not breach a clear rule of law as to constitute plain error); *Travis Seiber*, 2016 WL 716307, at *5 (holding that the trial court did not abuse its discretion in allowing the prosecutor to use a plastic handgun as a demonstrative aid to demonstrate distance during closing argument).

Trial courts also "have substantial discretionary authority in determining the propriety of final argument but must be careful to restrict any improper argument." *Travis Seiber*, 2016 WL 716307, at *5 (citing *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). Generally, closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to

the issues being tried.'" *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978) (quoting *Russell v. State*, 532 S.W.2d 268, 271 (Tenn. 1976)). The State "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007). "To merit a new trial, … the argument must be so inflammatory or improper as to affect the verdict." *Id.* at 459 (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)).

In *Travis Seiber*, this court held that the trial court did not abuse its discretion in allowing the prosecutor to use a plastic handgun as a demonstrative aid during closing arguments of an aggravated robbery trial in order to demonstrate the distance between the defendant and the victims during the offense. 2016 WL 716307, at *4-5. This court reasoned that the distance was a critical issue in the State's case because the case hinged on a victim's ability to view the defendant and the gun during the offense. *Id.* at *5. This court also reasoned that the plastic gun was similar to the gun described by the victim and that both the trial court and the prosecutor made it clear to the jury that the gun was not the one used in the offense. *Id.*

In the present case, the State argued, and the trial court found, that the prosecutor could use the handgun in arguing premeditation. Premeditation was a contested issue at trial, and the State's argument and demonstration suggesting that the Defendant pulled the trigger once, paused, and then pulled the trigger ten more times was a reasonable inference based upon the evidence presented at trial. The gun utilized by the prosecutor was a nine-millimeter handgun, which was the same type of gun used by the Defendant in committing the offenses, and both the trial court and the prosecution made it clear to the jury that the handgun was not the one used in the offenses. Under these circumstances, we conclude that the trial court did not abuse its discretion in permitting the prosecutor to utilize the handgun as a demonstrative aid during rebuttal closing argument.

Finally, the Defendant asserts that the prosecutor improperly referred to him as "the face of someone filled with hatred" and "the face of a coward" during the State's rebuttal closing argument in the penalty phase. However, the Defendant has waived this issue by failing to raise it in his motion for new trial. *See* Tenn. R. App. P. 3(e) "[N]o issue presented for review shall be predicated upon error in the … misconduct of jurors, parties or counsel … unless the same was specifically stated in a mother for a new trial; otherwise such issues will be treated as waived."); *State v. Jason Allen Cobb*, No. W2011-02437-CCA-R3-CD, 2013 WL 1223886, at *18 (Tenn. Crim. App. Mar. 26, 2013) ("Prosecutorial misconduct is an issue that appellants must raise in a motion for new trial."). While the State argued waiver in its brief, the Defendant did not file a reply brief and has not requested that this court review the issue for plain error. We decline to exercise our discretion to conduct a plain error review of the issue.

## CONCLUSION

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE